**EXHIBIT C**
**LIMITED PARTNERSHIP INTEREST**
**REDEMPTION OPTION AGREEMENT**

832861.8

## LIMITED PARTNERSHIP INTEREST
## REDEMPTION OPTION AGREEMENT

This Limited Partnership Interest Redemption Option Agreement ("**Agreement**") is made as of _____, 2013 [Enter date of Loan closing], by and between Justice Investors, a California limited partnership (the "**Partnership**" or "Justice"), Evon Corporation, a California corporation ("Evon") and the signatories listed below (each a "**Optionee**" and collectively, the "**Optionees**").

### RECITALS:

**WHEREAS,** Partnership and the Optionees are parties to that certain Amended and Restated Agreement of Limited Partnership dated November 30, 2010 (the "**Partnership Agreement**"); and

**WHEREAS,** each Optionee holds a "**Participation Percentage**" in the Partnership, as that term is defined in the Partnership Agreement in the amount set forth in **Exhibit A** attached hereto and by this reference made a part hereof; and

**WHEREAS,** the Partnership's primary asset is the land and improvements located at 750 Kearny Street, San Francisco, California currently operated as a Hilton Hotel (the "**Hotel Property**"); and

**WHEREAS,** the Partnership has undertaken to refinance its debt secured by the Hotel Property by obtaining a loan from [Lender] ("**Hotel Lender**") in the total amount of $_____ (the "**Hotel Loan**"), which exceeds the amount needed to retire existing debt of the Partnership and is intended to provide funds for (i) Partnership working capital, (ii) cash redemption payments to certain limited partners and (ii) the transactions contemplated by this Agreement; and

**WHEREAS,** Hotel Lender requires that the Hotel Property be placed in a separate special purpose entity consisting of a newly formed limited liability company wholly owned, directly or indirectly, by Partnership ("**Hotel SPE**")

**WHEREAS,** certain differences of view with respect to the future operations of the Partnership have arisen between Portsmouth Square Inc., the Managing General Partner of the Partnership (the "Managing General Partner"), and Optionees, resulting in Optionees' desire to obtain an option to cause the Partnership to redeem their interests in the Partnership should they so elect;

**WHEREAS,** for the foregoing reasons, the Partnership wishes to have an option to enable it to redeem the Optionees' interests in the Partnership under certain circumstances; and

**WHEREAS,** the Partnership is willing to grant to each Optionee the option to be redeemed and the Optionees are each willing to grant the Partnership the option to redeem the Optionees on the terms and conditions set forth herein.

### AGREEMENT:

NOW THEREFORE, in consideration of the foregoing recitals and the representations, warranties and covenants herein set forth, the parties hereto agree as follows:

1

832852.4

1. Creation of Property SPE.

   1.1. Partnership has created a manager-managed Delaware limited liability company (the "**Property SPE**") into which it shall transfer concurrently with the closing of the Hotel Loan an amount of money equal to One Million Three Hundred Eighty Five Thousand Dollars ($1,385,000.00) times the total Participation Percentages held by all Optionees set forth in **Exhibit A** attached hereto (the "Transferred Amount"). Evon shall be manager of the Property SPE, which shall be governed by a form of Operating Agreement substantially identical to the form attached hereto as **Exhibit B**.

   1.2. At all times Partnership shall be the sole member and owner of Property SPE.

2. Rights to Direct Purchase of Qualifying Property

   2.1. Each Optionee shall have the right, but not obligation, to cause Property SPE to expend an amount of money equal to One Million Three Hundred Eighty Five Thousand Dollars ($1,385,000.00) times the Participation Percentage set forth next to that Optionee's name in Exhibit A (with respect to each Optionee, the "**Optionee Allocable Amount**") to acquire and hold property or properties which that Optionee shall be entitled to receive in complete or partial redemption of the Optionee's Interest ("**Qualifying Property**"), subject to the terms and condition set forth in this Agreement, provided however that for each Optionee, the Optionee Allocable Amount shall be subject to reduction for any and all costs and expenses which are associated with any transaction undertaken by the Property SPE for the benefit of such Optionee.

   2.2. The rights granted to each Optionee under Section 2.1 hereof shall expire and be of no further force or effect at 5:00 pm Pacific Standard Time on the date which is 12 calendar months from the date of this Agreement.

3. Procedure for Purchases of Qualifying Property

   3.1. Optionees may select as Qualifying Property any property other than cash or marketable securities, as the term "marketable securities" is defined in Section 731(c)(2) of the United Stated Internal Revenue Code of 1986, as amended (the "**Code**"), subject to the following limitations:

      3.1.1. Qualifying Property shall consist solely of direct or indirect interests in real property (including limited partner interests in single-purpose entities owning real estate) or motor vehicles, subject to a determination by the manager of Property SPE, acting in its sole and absolute discretion, that the type of asset requested by an Optionee will not result in creation of an unacceptable liability risk on the part of Property SPE, Hotel SPE, the Partnership or any of its subsidiaries or partners and that acquisition and ownership of such property does not involve unreasonable complexity.

      3.1.2. Each Optionee shall negotiate the terms and conditions for purchase of specific Qualifying Property, to be reflected in a **Qualifying Property Purchase Agreement** with the seller of such property and shall bear any and all costs associated with creation of such contracts and due diligence associated with investigating potential Qualifying Property, subject to Section 3.2 of this Agreement;

2

3.1.3. Any direct or indirect (via interest in an entity) ownership of improved or unimproved real property, other than improved property consisting of a single family residence or condominium unit, shall be limited to property in which Optionee has delivered a Phase 1 Environmental Report (or similar third party environmental review meeting ASTM Phase I Standard) showing no conditions requiring remediation prior to acquisition;

3.1.4. Each Optionee shall give not less than twenty four (24) days' notice to the Partnership and the Property SPE of the proposed closing date for acquisition of Qualifying Property.  Such notice shall contain all material information concerning the proposed acquisition, shall be accompanied by an executed, notarized power of attorney in accordance with Section 4.5 of this Agreement, and (except as provided in Section 3.1.4.4 below) shall not be deemed to have been given until such time as the Optionee has provided all such information concerning the acquisition as has been requested in writing by Evon or the Managing General Partner of the Partnership.  Upon delivery of proper notice, Evon and the Managing General Partner of the Partnership shall determine that direct or indirect ownership of the Qualifying Property by Property SPE does not result in creation of unacceptable liability risk on the part of Property SPE, Hotel SPE, the Partnership, or any of its subsidiaries or partners, on the following basis:

3.1.4.1.   Within ten (10) days following delivery of proper notice set forth in Section 3.1.4 hereof,  Evon shall advise a requesting Optionee and the Managing General Partner of the Partnership of its conclusion, in its sole and absolute discretion, that the proposed Qualifying Property would or would not result in creation of an unacceptable liability risk to Property SPE, Hotel SPE, the Partnership or any of its subsidiaries or partners;

3.1.4.2.   If Evon concludes that the proposed Qualifying Property would not result in creation of such a liability risk, then concurrent with its notice of such conclusion, Evon shall supply the Managing General Partner with all information and material relating to the proposed Qualifying Property developed by Evon in the course of its evaluation and the Managing General Partner of the Partnership shall have an additional seven (7) days to advise Evon and the Optionee that the Qualifying Property does not meet the criteria required of Qualifying Property and set forth in Exhibit C attached hereto.  In this regard the Managing General Partner of the Partnership shall utilize reasonable judgement, applied in good faith to the review of the proposed Qualifying Property.  If the Managing General Partner in its reasonable business judgment concludes that additional materials are needed in order to determine if the Qualifying Property meets the required criteria set forth in Exhibit C, then the Managing General Partner shall immediately notify Evon, identifying the specific missing materials and setting forth its reason for so requesting, and Evon shall request Optionee obtain and provide such materials. The Managing General Partner shall have three (3) days from the receipt of such additional materials to advise Evon and the Optionee that the Qualifying Property does not meet the required criteria.  Any and all costs that the Managing General Partner incurs in conjunction with its review of the Qualifying Property shall be borne by the Partnership.

3.1.4.3.   If either the Managing General Partner of the Partnership, and/or Evon acting according to the standards set forth in Sections 3.1.4.1 and 3.4.1.2 above, concludes that a proposed Qualifying Property would result in creation of an unacceptable liability risk to the Property SPE, the Hotel SPE, the Partnership or any of its subsidiaries or partners, the Managing General Partner of the Partnership and/or Evon, as applicable, shall state the nature of such risks and the conditions, if any,

3

that would allow the Managing General Partner of the Partnership and/or Evon, as applicable to approve the proposed property (it being acknowledged that the foregoing shall in no way limit the right of Evon and the Managing General Partner to exercise its discretion in such matter);

    3.1.4.4.    In the event that the Optionee has substantially all materials, but is missing a particular item or items, it may nevertheless provide the materials it has and seek conditional approval of the property (for example if it is approaching a deadline for depositing money), provided, however, that the Optionee understands (i) any condition will need to be satisfied before the property is deemed to be officially approved; and (ii) the foregoing shall in no way limit the right of Evon and the Managing General Partner to exercise its discretion in such matter.

3.1.5. Property SPE shall not be responsible for expending more than the Optionee Allocable Amount, less the reduction provided in Sections 2.1, 3.2 and 3.4 hereof, with respect to acquisition of Qualifying Property; provided, however that Optionee may loan funds to Property SPE on terms reasonably acceptable to Property SPE or arrange for Property SPE to obtain lender financing for any portion of the purchase price for Qualifying Property if, but only if, none of the Property SPE, Hotel SPE, the Partnership or any of its subsidiaries or partners (other than Optionee), or the Managing General Partner or its affiliates is required to assume or undertake any liability with respect to such financing, which must be expressly non-recourse to Property SPE, Hotel SPE and Partnership and must provide that Property SPE is authorized to convey title to the Qualifying Property in the manner and at the times contemplated by this Agreement.

3.1.6. Optionee must provide Property SPE, Hotel SPE, Partnership, and Partnership's general and limited partners (other than Optionee) with an indemnity relating to Qualifying Property chosen by Optionee pursuant hereto in form attached hereto as **Exhibit D**.

3.1.7. Pursuant to the foregoing procedures, the Managing General Partner of the Partnership and/or Evon, shall be entitled to decline to approve or to participate in acquisition of any property not satisfying the criteria set forth herein for Qualifying Property, in which event such acquisition shall not proceed.

3.2. By execution of an assignment of the Qualifying Property Purchase Agreement in a form substantially in the form of **Exhibit E** herein, or provided by or otherwise acceptable to Property SPE ("**Qualifying Property PSA Assignment**"), Optionee will assign to and, subject to the terms and conditions of this Agreement, Property SPE will accept from Optionee all Optionee's rights as buyer under a Qualifying Property Purchase Agreement, including any deposits provided for therein and, at Optionee's request, reimburse Optionee for the amount of any such deposits to which Property SPE succeeds and for Optionee's out of pocket costs incurred in connection with forming the Qualifying Property Purchase Agreement and conducting due diligence activities relating to the subject Qualifying Property. Any such reimbursements shall reduce the Optionee Allocable Amount of the recipient Optionee. In addition, any out of pocket costs (such as closing costs) incurred by the Property SPE in completing the purchase transaction shall reduce the Optionee Allocable Amount of the Optionee designating the Qualifying Property. Optionee shall also provide Property SPE with timely written notice of any interim steps (such as increased deposits or contingency removals) that need to be taken prior to the closing pursuant to the Qualifying Property Purchase Agreement. If an Optionee is not the purchaser under the Qualifying Property Purchase Agreement, that Optionee will cause the purchaser under such Qualifying

4

Property Purchase Agreement to execute the Qualifying Property PSA Assignment to Property SPE. Property SPE will be substituted in place of the Optionee (or purchaser, as the case may be) as buyer. Property SPE shall give notice of the Qualifying Property PSA Assignment to all parties to the Qualifying Property Purchase Agreement prior to closing the transactions described herein.

3.3. Property SPE shall, at its sole and complete discretion (but at no expense to the Partnership) be entitled to form a subsidiary limited liability company to act in its place to acquire and hold any Qualifying Property (each a **"Qualifying Property SPE"**). In such event, the Optionee selecting the Qualifying Property shall be responsible for all costs and expenses incurred by Property SPE in establishing such Qualifying Property SPE.

3.4. To reimburse Property SPE for costs associated with acquisition of Qualifying Property, the Optionee Allocable Amount applicable to any Optionee electing to select Qualifying Property pursuant to this Agreement shall be reduced by 0.5% of all amounts, including borrowed funds, expended by Property SPE in connection with the acquisition of such Qualifying Property; provided that the minimum reduction shall be $4,000 ($500 in the case of a motor vehicle) and the maximum reduction shall be $15,000 with respect to each acquisition of Qualifying Property. Amounts provided herein are exclusive of costs described in Sections 3.2 and 4.7. Notwithstanding the foregoing, if the complexity of the acquisition is such that Evon concludes, in its reasonable discretion, that the fee set forth in this paragraph is insufficient to cover the costs of review and processing of the transaction, then Evon may so notify the Optionee and the Optionee shall pay such additional costs. The fee set forth in this paragraph 3.4 shall be incurred whether or not the transaction actually closes, and shall be charged for each transaction submitted by an Optionee.

3.5. Subject to the limitations set forth in this Agreement, Property SPE agrees to acquire the Qualifying Property from the seller thereof.

3.6 For the avoidance of doubt and in furtherance of Section 2.1, it is expressly acknowledged that: (i) the sole financial obligation of the Partnership under this Agreement is to deposit the Transferred Amount to the Property SPE; (ii) the Partnership shall have no obligation to bear any additional cost or expense related to the establishment, maintenance or administration of the Property SPE, except as set forth in Section 3.1.4.2; (iii) in the event the amounts reserved by Property SPE pursuant to Section 3.4 are insufficient for there purposes Property SPE and Evon shall deal with the Optionees as shall be necessary to cover such shortfall at no cost, expense or liability whatsoever to Hotel SPE, the Partnership or any of its subsidiaries or any of its partners (other than Evon and the Optionees).

4. Redemption of Optionee's Interest.

4.1. In the event Optionee elects to call for Property SPE to acquire Qualifying Property on the terms provided herein, Optionee shall have the option, but not the obligation, to require distribution to the electing Optionee of such Qualifying Property or the membership interest in any Qualifying Property SPE formed to acquire such Qualifying Property upon written notice to Property SPE, (a **"Optionee Qualifying Property Distribution Notice"**) which notice can be given not earlier than fifteen (15) days and not later than thirty (30) days following the closing of the acquisition of the Qualifying Property by Property SPE or by a Qualifying Property SPE, and the closing of such redemption transfer shall occur within five (5) days following the Optionee Qualifying Property Distribution Notice.

4.2. In the event Optionee does not exercise the option provided in Section 4.1, then Partnership shall have the option, but not the obligation, to require that Optionee accept a distribution of

the Qualifying Property, or of the membership interest in a Qualifying Property SPE holding the Qualifying Property, in partial or complete redemption of Optionee's partnership interest in Partnership, with any partial interest based on the percentage determined by dividing the money expended by Property SPE to acquire the Qualifying Property by Optionee's Allocable Amount less any deductions set forth in Sections 3.2 and 3.4 herein or as otherwise may be required to implement Section 3.6 herein. Partnership shall exercise this option by giving written notice to the Optionee, (a "**Partnership Qualifying Property Distribution Notice**") which notice must be given not later than fifteen (15) days following expiration of Optionee's allowed period to give the Optionee Qualifying Property Distribution Notice, and the closing of such redemption transfer shall occur within ten (10) days following the Partnership Qualifying Property Distribution Notice. Evon agrees to take all necessary steps to implement the Partnership's option set forth herein.

4.3. In the event the options described in Sections 4.1 and 4.2 lapse, the Qualifying Property shall remain property of Property SPE.

4.4. To the extent that Property SPE has not expended an amount of money to purchase Qualifying Property at the request of any Optionee equal to that Optionee's Optionee Allocable Amount, then such Optionee shall have the option, but not obligation, to elect to transfer to the Partnership the Optionee's remaining interest in the Partnership, including all rights with respect thereto, for an amount of money equal to the Optionee's Optionee Allocable Amount, less any sum expended by Property SPE to acquire Qualifying Property that has been distributed to the Optionee on exercise of the options contained in Sections 4.1 or 4.2 of this Agreement and reimburseable costs incurred by Property SPE in connection therewith. The option contained in this Section 4.4 may be exercised by each Optionee during the period beginning on expiration of the option period provided in Section 2.2 of this Agreement and ending thirty (30) days thereafter and shall be exercised by the Optionee giving written notice of exercise to the Partnership and Property SPE, which notice shall include Optionee's computation of the amount due Optionee upon exercise ("**Optionee Final Exercise Notice**"). Closing of the transfer contemplated hereby shall occur within fifteen (15) days of Partnership's receipt of the Optionee Final Exercise Notice.

4.5. To the extent that the Property SPE has not expended an amount to purchase the Qualifying Property equal to that Optionee's Optionee Allocable Amount, and the Optionee does not exercise the option provided in Section 4.4, then following expiration of Optionees' option and for a period of ten (10) days thereafter, the Partnership shall have the option, but not obligation, to elect to require the Optionee to transfer the Optionee's remaining interest in the Partnership, including all rights with respect thereto, for an amount of money equal to the Optionee's Optionee Allocable Amount, less any sum expended by Property SPE to acquire Qualifying Property that has been distributed to the Optionee on exercise of the options contained in Sections 4.1 or 4.2 of this Agreement and reimburseable costs incurred by Property SPE in connection therewith. Evon agrees to take all necessary steps to implement the Partnership's option as set forth herein. The Optionee shall grant to the Partnership a binding, irrevocable, power of attorney, in the form of **Exhibit F** hereto, upon Optionee's submission of any property for consideration as a Qualifying Property pursuant to Section 3.1.4 of this Agreement.

4.6. In the event of exercise of any of the options provided in this Section 4, upon receipt by an Optionee of Qualifying Property and money representing expenditure by Property SPE of funds (not considering any borrowed amounts) equal to that Optionee's Optionee Allocable Amount, that Optionee's interest in Partnership shall be considered fully redeemed and that Optionee shall thereafter have no interest in the profits, losses or capital of Partnership.

832852.4

4.7. Each Optionee shall bear all costs of transfer required to implement the redemption of Optionee's interest in Partnership provided in this Section 4. Partnership shall have the right to collect such costs prior to completing the transfer.

5.   Representations and Warranties of Optionees. Each Optionee represents and warrants to the Partnership that:

5.1. <u>Title</u>. Optionee has good and marketable title to Optionee's Partnership Interest which is to be transferred to Partnership by Optionee pursuant hereto, free and clear of any and all covenants, conditions, restrictions, voting trust arrangements, liens, charges, encumbrances, options, and adverse claims or rights whatsoever.

5.2. <u>Authority</u>. Such Optionee has full right, power, and authority to enter into this Agreement and to transfer, convey, and sell to Partnership such Optionee's Partnership Interest hereunder and upon consummation of the redemption contemplated hereby, Partnership will acquire from such Optionee good and marketable title to such Optionee's Partnership Interest, free and clear of all covenants, conditions, restrictions, arrangements, liens, charges, encumbrances, options, and adverse claims or rights whatsoever. Assuming due authorization, execution and delivery of this Agreement by Partnership, this Agreement constitutes a valid and binding agreement of such Optionee enforceable against such Optionee in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights, and to general equity principles. As of the Effective Date, after giving effect to the transactions contemplated by this Agreement, each Optionee represents, warrants, acknowledges, and agrees that: (a) such Optionee will hold no interest in Partnership or any other interest convertible into or exchangeable for any interest in Partnership, and (b) such Optionee shall no longer be a limited partner of Partnership.

5.3. <u>No Legal Bar</u>. Such Optionee is not a party to, subject to or bound by any agreement or judgment, order, writ, prohibition, injunction, or decree of any court or other governmental body which would prevent the execution or delivery of this Agreement or the transfer, conveyance and sale of Optionee's Partnership Interest pursuant to the terms hereof.

5.4. <u>No Tax Representations.</u>   Each Optionee confirms that neither the Partnership nor its General Partners, Portsmouth Square, Inc. and Evon, nor any of their attorneys, accountants, or agents shall be responsible in any manner to any party related hereto for tax consequences resulting from this transaction. Each Optionee has been represented by its own legal and tax counsel in connection with the transactions contemplated in this Agreement. Neither the Partnership nor any of its General Partners, nor any of their attorneys, accountants or agents has made any warranties or representations that the transactions contemplated herein qualify for the deferral of all or any portion of realized gain should Optionee elect to exercise any or all of the options provided herein.

6.   <u>General Provisions</u>

6.1. <u>Amendments</u>. No addition to or modification of any term or provision of this Agreement shall be effective unless set forth in writing and signed by all of the parties to be charged.

6.2. <u>Construction of Agreement</u>. The agreements contained herein shall not be construed in favor of or against either party, but shall be construed as if both parties prepared this Agreement.

6.3. <u>Headings</u>. The paragraph headings herein are used only for the purpose of convenience and

7

shall not be deemed to limit the subjects of the paragraphs of this Agreement or considered in their construction.

6.4. <u>Resolution of Disputes</u>. If an irreconcilable conflict or disagreement should arise under this Agreement, the parties agree to make a reasonable, good faith effort to resolve the dispute through the use of a neutral mediator before resorting to litigation. The mediator must be mutually agreeable to both parties. The parties shall bear their own attorney's fees and split costs of the mediator equally. If a reasonable, good faith mediation effort does not resolve the dispute, then and only then may the complaining party resort to litigation. The parties agree that the mediation shall take place in San Francisco, California.

6.5. <u>Governing Law; Venue</u>.   This Agreement shall be governed, construed and interpreted in accordance with the laws of the State of California without giving effect to that state's choice of law rules. Subject to Section 6.4 of this Agreement, the courts of San Francisco, California (if under state law) or the Northern District of California (if under federal law) will have exclusive jurisdiction and venue of any actions brought with respect to the interpretation or enforcement of this Agreement. The parties hereby submit to the personal jurisdiction of said courts in California. All parties for themselves and their successors and assigns waive trial by jury of any and all disputes arising under or connected with this Agreement and agree that all such disputes shall be tried and decided solely by a judge sitting without a jury. In the event any litigation is brought in state or federal court to interpret or enforce the terms of the this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and costs in addition to all other relief awarded by the court.

6.6. <u>Time of the Essence</u>. Time is of the essence of each and every obligation and condition of this Agreement.

6.7. <u>Successors and Assigns</u>. This Agreement shall be binding on and inure to the benefit of the parties and their respective successors and permitted assigns.

6.8. <u>Severability</u>. If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the rest of the Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

6.9. <u>Notices</u>. Any notice required or permitted to be given under this Agreement shall be in writing and either delivered personally to the other party hereto or sent by facsimile transmissionl or certified or registered mail, postage prepaid, and properly addressed, if to Partnership or Property SPE, to: 750 Kearny Street, Suite 502, San Francisco, CA 94108 Attn: Geoffrey Palermo, Facsimile (415) 984-0783 with copy to Evon Corporation, 1261 Redwood Lane, Lafayette, CA 94549, Attn: Scott Braunstein, Facsimile: (925)385-0423, and if the Optionees to the addresses hereinafter set forth or to such other place as the other party may hereafter designate in writing. Notices shall be deemed effective on the date of personal delivery, on the date shown on a confirmation of successfule facsimile transmission or three (3) days following deposit in the U.S. mail in accordance herewith.

6.10. <u>Further Assurances</u>. Each of the parties shall execute and deliver all additional papers, documents and other assurances, and shall do all acts and things reasonably necessary in

832852.4

connection with the performance of their obligations hereunder to carry out the intent of this Agreement.

6.11. <u>Survival of Covenants</u>.  All covenants, representations, warranties, obligations and agreements contained in this Agreement shall survive the execution and delivery of this Agreement and the closing and the delivery and recordation of all documents or instruments in connection therewith.

6.12. <u>Time References</u>.  Any reference in this Agreement to time for performance of obligations or to elapsed time shall mean consecutive calendar days, months or years, as applicable, unless otherwise explicitly indicated herein.

6.13. <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed as an original, but all of which together, shall constitute one and the same instrument.

6.14. <u>No Third-Party Beneficiaries</u>.  This Agreement shall be treated as an agreement between the parties to this Agreement, but not as to any other third party.  The parties hereto shall not be deemed to be in privity of contract with any other third party nor shall any provision of this Agreement be construed or deemed to create any third-party beneficiary status for any third party.

[Signature Pages Follow]

9

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be signed as of the date first above written.

**Partnership:**

Justice Investors,
a California limited partnership

By: Portsmouth Square Inc.
    Its Managing General Partner

By:_____
Its:

Evon Corporation,
a California corporation

By:_____
Its:

10

Signatures Continued:

**OPTIONEE:**

_____

Name:_____

Address:_____

_____

_____

Facsimile _____

832852.4

**Exhibit A**
Schedule of Optionees and Their Interests

(In this exhibit, participation percentages will be set forth as a percentage of 100.  Thus, a 2% interest
would have a participation percentage of 2.0, and the amount deposited for that limited partner would
therefore be $2,770,000.)

832852.4

**Exhibit B**

Form of Property SPE Operating Agreement

832852.4

**EXHIBIT B**

LIMITED LIABILITY COMPANY AGREEMENT

OF

JUSTICE HOLDINGS, LLC

LIMITED LIABILITY COMPANY AGREEMENT OF JUSTICE HOLDINGS, LLC, dated as of [_____ __, 20__], entered into by Justice Investors, a California limited partnership ("Justice"), as the sole member.

WHEREAS, Justice Holdings LLC (the "Company") was formed as a Delaware limited liability company pursuant to the filing of a Certificate of Formation in the office of the Secretary of State of the State of Delaware on [_____ __, 20__]; and

WHEREAS, Justice by this document intends to establish the operating rules by which the Company is to be governed.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Justice hereby agrees as follows:

**ARTICLE I**
**Definitions**

1.1   *Definitions*.   In this Agreement, the following terms shall have the meanings set forth below:

(a)   "Act" or "Delaware Act" means the Delaware Limited Liability Company Act, as amended.

(b)   "Capital Account" when used with respect to any Member means the capital account maintained for such Member in accordance with Section 5.3 hereof, as such capital account may be increased or decreased from time to time pursuant to the provisions of Section 5.3.

(c)   "Capital Contribution" means the total amount of cash and the agreed net fair market value of other property contributed to the Company by a Member pursuant to Section 5.1 hereof.  Any reference to the Capital Contribution of a Member shall include the Capital Contribution made by any predecessor holders of such Member's Membership Interest.

(d)   "Certificate of Formation" means the Certificate of Formation of the Company filed on [_____ __, 20__], with the office of the Secretary of State of the State of Delaware, as may be further amended from time to time.

(e)   "Code" means the Internal Revenue Code of 1986, as amended and in effect from time to time, or any superseding federal revenue statute.

(f)   "Distribution" means any cash and other property paid to a Member by the Company from the operations of the Company.

(g)     "Fiscal Year" means a calendar year.

(h)     "Manager" has the meaning set forth in Section 4.1.

(i)     "Member" means Justice and any other Person that may hereafter become a member of the Company pursuant to the terms hereof.

(j)     "Member Nonrecourse Debt" means a nonrecourse debt of the Company within the meaning of Section 1.704-2(b)(4) of the Treasury Regulations.

(k)     "Member Nonrecourse Deductions" means the items of loss, deduction, and expenditure attributable to Member Nonrecourse Debt within the meaning of Section 1.704-2(i)(2) of the Treasury Regulations.

(l)     "Membership Interests" means the respective percentage interests in the Company held by each Member, of which 100% is held by Justice as of the date hereof.

(m)     "Net Losses" means the net losses of the Company, if any, determined in accordance with federal income tax principles.

(n)     "Net Profits" means the net income of the Company, if any, determined in accordance with federal income tax principles.

(o)     "Person" means any individual, corporation, governmental authority, limited liability company, partnership, trust, joint stock company, business trust, joint venture, unincorporated association or other entity.

(p)     "Required Members" means Members holding not less than a majority of all of the Membership Interests.

(q)     "Treasury Regulations" means all proposed, temporary and final regulations promulgated under the Code as from time to time in effect.   References in this Agreement to specific sections of the Treasury Regulations shall also refer to the corresponding sections of succeeding Treasury Regulations as they may be amended from time to time.

## ARTICLE II
## Organization

2.1     *Formation.*   The Company was formed on [_____ __, 20__], by having one or more Persons act as the organizer or organizers of the Company by preparing, executing and filing the Certificate of Formation with the office of the Secretary of State of the State of Delaware pursuant to the Act.   The acts of such Person are hereby authorized and ratified.

2.2     *Name.*   The name of the Company is Justice Holdings LLC, or such other name as the Manager may from time to time select.

2.3     *Principal Place of Business.*   The principal place of business of the Company shall be c/o Evon Corporation, _____.   The Manager shall

- 2 -

have the right to change the principal place of business of the Company to the office of any Member, or otherwise, subject to the provisions of the Act. In addition, the Company may establish any other places of business as the Manager may from time to time deem advisable.

2.4     *Registered Office.*    The Company's registered office shall be located c/o _____, or such other place in the State of Delaware as the Manager may from time to time determine.

2.5     *Term.*    The term of the Company shall commence on the date of filing of the Certificate of Formation with the Delaware Secretary of State and terminate upon the dissolution of the Company pursuant to the provisions of the Act or Article VIII below.

2.6     *Purposes; Powers.*    The purpose of the Company shall be to carry on any lawful business, purpose or activity, whether or not for profit, to the fullest extent provided in the Delaware Act. The Company shall possess and may exercise all the powers and privileges granted by the Delaware Act or by any other law or by this Agreement, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the businesses, purposes or activities of the Company.

### ARTICLE III
### Member
### Transfers of Interests

3.1     *Name and Address.*    As of the date hereof, Justice Investors is the sole member of the Company, having an address of 750 Kearny Street, San Francisco, California 94018.

3.2     *Additional and Substituted Members; Transfers of Membership Interests.*

(a)     One or more additional members of the Company may be admitted to the Company after the date of this Agreement with the prior written consent of the Manager.

(b)     Without the prior written consent of the Manager, no Member may sell, assign, transfer or encumber, in whole or in part, any of such Member's Membership Interest.

3.3     *Limitation of Liability.*    A Member's liability to the Company, to any other Member or to any third party shall be limited to the maximum extent permitted by law. A Member shall not be personally liable for any indebtedness, liability or obligation of the Company, except that such Member shall remain personally liable for the payment of its Capital Contribution and as otherwise expressly set forth in this Agreement, the Act and any other applicable law.

3.4     *Priority and Return of Capital.*    If there is more than one Member, no Member shall have priority over any other Member, whether for the return of a Capital Contribution or for Net Profits, Net Losses or a Distribution; provided, however, that this Section 3.4 shall not apply to any loan or other indebtedness (as distinguished from a Capital Contribution) made by a Member to the Company.

- 3 -

832521.4

3.5 *Liability of a Member to the Company*. A Member that rightfully receives the return of any portion of a Capital Contribution is liable to the Company only to the extent now or hereafter provided by the Act. A Member that receives a Distribution made by the Company in violation of this Agreement or made when the Company's liabilities exceed its assets (after giving effect to such Distribution) shall be liable to the Company for the amount of such Distribution.

3.6 *Financial Adjustments*. No Member admitted after the date of this Agreement shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. If there is more than one Member, the Manager may, at its discretion, at the time a Member is admitted, close the books and records of the Company (as though the Fiscal Year had ended) or make pro rata allocations of loss, income and expense deductions to such Member for that portion of the Fiscal Year in which such Member was admitted, in accordance with the Code.

3.7 *Action by Members Without a Meeting*. Whenever the Members of the Company are required or permitted to take any action by vote, such action may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Members who hold voting interests having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all of the Members entitled to vote thereon were present and voted and shall be delivered to the administrative office of the Company, or to an employee or agent of the Company.

3.8 *No Exclusive Duty to Company*. A Member may have other business interests and may engage in other activities in addition to those relating to the Company, whether or not such business interests or activities may be competitive with those of the Company.

### ARTICLE IV
### Management

4.1 *Management*.

(a) The business, affairs and management of the Company, including its policies and administration, shall be vested in one or more managers, each of whom may, but need not be, a Member (each, a "Manager"). The Manager shall have the sole power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by managers under the Act.

(b) Evon Corporation, a California corporation ("Evon"), is hereby designated as the Manager, and shall serve until the earlier of (i) Evon's resignation as Manager or (ii) the satisfaction of the obligations of all parties under the Limited Partner Interest Redemption Option Agreement (the "Redemption Option Agreement") that has been executed by (among others), Justice and Evon. At such time as all obligations under the Redemption Option Agreement have been satisfied, then the Manager may be removed, with or without cause, upon the consent of the Required Members, which removal shall take effect at such time as determined by the Required Members. Initially there shall be one Manager. If at any time there shall be

- 4 -

more than one Manager, all references in this Agreement to "Manager" shall be deemed to be references to all or each of such Managers, as appropriate, and any action by or consent, vote, determination, agreement or notice of the Managers under this Agreement shall be taken, made or given by a majority of the Managers then in office.

(c)     The Manager may not be removed except in accordance with this Agreement. The Manager may resign as Manager by giving written notice to the Company and each Member, and such resignation shall take effect at such time as is specified in such notice of resignation. The resignation or removal of the Manager shall not affect such Manager's rights as a Member, if any, and shall not constitute a withdrawal of a Member. Upon the removal or resignation of the Manager, the successor Manager shall be designated by the Required Members.

4.2     *Reliance by Third Parties*. Each contract, agreement, deed, mortgage, security agreement, promissory note or other instrument or document executed by the Manager with respect to any business or property of the Company shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (a) at the time of the execution and delivery thereof this Agreement was in full force and effect, (b) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Company, and (c) the Manager was duly authorized and empowered to execute and deliver, and to cause the Company to perform any and every such instrument or document for and on behalf of the Company.

4.3     *Binding Authority of Manager*. No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member. Subject to Section 4.7, only the Manager may act for the Company in connection with the ordinary course of its day-to-day business and with respect to all other matters.

4.4     *Manager Discretion*. Whenever in this Agreement the Manager is permitted or required to make a decision in its "discretion" or "sole discretion" or under a grant of similar authority or latitude, the Manager shall have no duty or obligation (including any fiduciary duty) to consider any interest of or factors affecting some or all the Members so long as the Manager acts in good faith and in a manner which it reasonably believes are in or not opposed to the best interest of the Company. Each Member hereby agrees that any standard of care or duty imposed under the Delaware Act or any other applicable law shall be modified, waived or limited in each case as required to permit the Manager to act under this Agreement and to make any decision pursuant to the authority prescribed in this Section 4.4 so long as such action or decision does not constitute gross negligence or intentional disregard of the terms of this Agreement and is reasonably believed by the Manager to be consistent with the overall purposes and objectives of the Company. Notwithstanding the foregoing, the Manager shall be required to invest all liquid funds of the Company in bank accounts, money market accounts, U.S. government treasury bills or short term depository instruments bearing the highest available credit ratings.

4.5     *No Exclusive Duty to Company*. The Manager shall not be required to manage the Company as its sole and exclusive function and may have other business interests and may engage in other activities in addition to those relating to the Company. The Member

832521.4

acknowledges that the Manager and its affiliates may pursue such other business opportunities for their respective accounts regardless of whether they have learned of such opportunity in the course of the Company's business.  Neither the Company nor any Member shall have any right pursuant to this Agreement to share or participate in such other business interests or activities or to the income or proceeds derived therefrom.  The Manager shall not incur any liability to the Company or any Member as a result of engaging in any other business interests or activities.

4.6     *Compensation.*  The Manager shall be entitled to be reimbursed for its direct and indirect costs of rendering the services described herein, which reimbursement shall equal the net income of the Company, after allocation of all costs and expenses paid to third parties.

4.7     *Indemnification.*  The Company shall indemnify and hold harmless the Manager and each officer and agent of the Company from and against all claims and demands to the maximum extent permitted under the Act.

4.8     *Officers and Authorized Persons.*

(a)     The Manager may designate one or more individuals as officers or agents of the Company, who may but need not have titles, and shall exercise and perform such powers and duties as shall be assigned and delegated to them from time to time by the Manager.  Any such officer or agent (an "Authorized Person") may be removed by the decision of the Manager at any time, with or without cause.  Each officer shall hold office until his or her successor is elected and qualified, unless earlier removed in accordance with this Section 4.7.  Any number of offices may be held by the same individual.  The salaries and other compensation, if any, of the Authorized Persons shall be fixed by the Manager in its sole discretion.

(b)     The Authorized Persons, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Manager not inconsistent with this Agreement, are agents of the Company for the purpose of the Company's business and the actions of the Authorized Persons taken in accordance with such powers shall bind the Company.

(c)     The Manager hereby designates and appoints _____ and _____ as the initial Authorized Persons of the Company for the purposes set forth in Sections 4.7(d).

(d)     The Company is hereby authorized to execute, deliver and perform, and the Manager and each of _____ and _____, each as an Authorized Person, acting alone on behalf of the Company, is hereby authorized to execute and deliver, in the name of the Company, any and all agreements, certificates, instruments, amendments or other documents to be executed and delivered by the Company, in its own capacity or in any other authorized capacity, all without any further act, vote or approval of any Member or any other person or entity notwithstanding any other provision of this Agreement.  Notwithstanding any provisions of this Agreement, the Manager and any Authorized Person shall have the right to act for and bind the Company and may execute and deliver any document, instrument or contract on behalf of the Company without any vote or consent of any Member or other person or entity.

- 6 -

## ARTICLE V
## Capital Contributions

    5.1    *Capital Contributions.*  Concurrently with the execution and delivery of this Agreement, Justice has made or deemed to have made the capital contributions as reflected on the books and records of the Company as of the date hereof.

    5.2    *Additional Contributions.*  Except as set forth in Section 5.1, no Member shall be required to make any Capital Contribution.

    5.3    *Capital Accounts.*  If there is more than one Member, a Capital Account shall be maintained for each Member.  Said Capital Account shall be kept in accordance with the provisions of Section 1.704-1(b)(2)(iv) of the Treasury Regulations.  Without limiting the foregoing, each Member's Capital Account shall be (a) increased by the net agreed value of each Capital Contribution made by such Member, allocations to such Member of the Net Profits and any other allocations to such Member of income pursuant to the Code, and (b) decreased by the net agreed value of each Distribution made to such Member by the Company, allocations to such Member of Net Losses and other allocations to such Member pursuant to the Code.

    5.4    *Transfers.*  Upon a permitted sale or other transfer of a Membership Interest in the Company, the Capital Account of the Member transferring its Membership Interests shall become the Capital Account of the Person to whom such Membership Interest is sold or transferred in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

    5.5    *Modifications.*  The manner in which Capital Accounts are to be maintained pursuant to this Section is intended to comply with the requirements of Section 704(b) of the Code.  If in the opinion of the Members the manner in which Capital Accounts are to be maintained pursuant to this Agreement should be modified to comply with Section 704(b) of the Code, then the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

    5.6    *Deficit Capital Account.*  Except as otherwise required in the Act or this Agreement, no Member shall have any liability to restore all or any portion of a deficit balance in a Capital Account.

    5.7    *Withdrawal or Reduction of Capital Contributions.*  A Member shall not receive from the Company any portion of a Capital Contribution until all indebtedness and liabilities of the Company, except any indebtedness, liabilities and obligations to Members on account of their Capital Contributions, have been paid or there remains property of the Company, in the sole discretion of the Members, sufficient to pay them.  A Member, irrespective of the nature of the Capital Contribution of such Member, has only the right to demand and receive cash in return for such Capital Contribution.

832521.4

## ARTICLE VI
### Allocations and Distributions

6.1     *Allocations of Profits and Losses and Distributions if There is One Member.*  So long as there shall be only one Member, the Net Profits and Net Losses of the Company shall belong to such Member and any Distributions determined to be made by the Manager shall be distributed to such Member.  The sole Member may direct the Company to make distributions pursuant to rights of owners, partners or other participants in Member under Member's governing documents.  Distribution of liquidation proceeds shall be governed by Section 8.2.  Sections 6.2, 6.3 and 6.4 applies if there shall be more than one Member.

6.2     *Allocations of Profits and Losses.*  If there is more than one Member, the Net Profits and the Net Losses for each Fiscal Year shall be allocated among the Members in accordance with the respective Membership Interests.

6.3     *Required Special Allocations if there is More than One Member.*  Notwithstanding Section 6.2 hereof, if there is more than one Member:

    (a)     Appropriate adjustments shall be made to the allocations of Net Profits and Net Losses to the extent required under Section 704(c) of the Code and the Treasury Regulations thereunder and under Sections 1.704-1(b)(2)(iv)(d), (e), (f) and (g) of the Treasury Regulations.

    (b)     Any Member Nonrecourse Deductions shall be specially allocated to the Member(s) that bear(s) the economic risk of loss with respect to the Member Nonrecourse Debt to which the Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Treasury Regulations.

    (c)     Appropriate adjustments shall be made to the allocations of Net Profits and Net Losses to the extent required to comply with the "qualified income offset" provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations, the Company "minimum gain chargeback" provisions of Section 1.704-2(f) of the Treasury Regulations, and the Member "minimum gain chargeback" provisions of Section 1.704-2(i)(4) of the Treasury Regulations, all issued pursuant to Section 704(b) of the Code.  To the extent permitted by such Treasury Regulations, the allocations in such year and subsequent years shall be further adjusted so that the cumulative effect of all the allocations shall be the same as if all such allocations were made pursuant to Section 6.2 hereof (as adjusted by Section 6.3(a) hereof) without regard to Section 6.3(b) and this Section 6.3(c).

6.4     *Distributions.*  If there is more than one Member, the Manager may from time to time make Distributions pro rata in proportion to Membership Interests as of the record date set for such Distribution.  Distribution of liquidation proceeds shall be governed by Section 8.2.

6.5     *Offset.*  The Company may offset all amounts owing to the Company by a Member against any Distribution to be made to such Member.

6.6     *Limitation Upon Distributions.*  No Distribution shall be declared and paid unless, after such Distribution is made, the assets of the Company are in excess of all liabilities of the Company.

6.7     *Interest on and Return of Capital Contributions.*  No Member shall be entitled to interest on its Capital Contribution or to a return of its Capital Contribution, except as specifically set forth in this Agreement.

6.8     *Accounting Period.*  The accounting period of the Company shall be the Fiscal Year.

## ARTICLE VII
### Taxes; Books and Records; Information

7.1     *Tax Returns.*  If there is more than one Member, the Manager shall cause to be prepared and filed all necessary federal and state income tax returns for the Company.  Each Member shall furnish to the Manager all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.

7.2     *Tax Elections.*  If there is more than one Member, the Company shall make such elections on the appropriate tax returns as the Manager may deem appropriate and in the best interests of the Members.  Neither the Company nor any Member may make an election for the Company to be taxed as a corporation under the Code or any similar provisions of applicable state law, and no provisions of this Agreement shall be interpreted to authorize any such election.

7.3     *Tax Matters Partners.*  If there is more than one Member, the Manager shall designate the Member to be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code.

7.4     *Books and Records.*  The Company shall keep books and records of accounts and minutes of all decisions taken by the Member and the Manager.

7.5     *Information.*  A Member may inspect during ordinary business hours and at the principal place of business of the Company the Certificate of Formation, this Agreement, the minutes of any decision of the Member or meeting of the Manager, any tax returns of the Company for the immediately preceding three Fiscal Years, and all other business records in the possession of the Company; provided that such inspection does not unreasonably interfere with the day-to-day operations of the Company and are for a purpose reasonably related to the Member's interest in the Company.

## ARTICLE VIII
### Dissolution

8.1     *Dissolution.*  The Company shall be dissolved and its affairs shall be wound up upon the first to occur of the following:

832521.4

      (a)      Following the satisfaction of all obligations under the Redemption Option Agreement, the unanimous vote or written consent of the holders of all the Membership Interests; or

      (b)      The entry of a decree by a court of competent jurisdiction that dissolution and liquidation of the Company is required by law.

      8.2     *Winding Up.*  Upon the dissolution of the Company, the Manager may, in the name of and for an on behalf of the Company, prosecute and defend suits, whether civil, criminal or administrative, and sell or otherwise dispose of the Company's assets to the extent permitted by any agreement dealing with the Company's assets, discharge the Company's liabilities for which a Member or Members have assumed personal liability and distribute to the Members any remaining assets of the Company, all without affecting the liability of Members.  Upon such a winding up of the Company, the assets shall be distributed as follows:

      (a)      <u>First</u>, to the payment of the debts and liabilities of the Company, including Members who are creditors, including any expenses of the Company incidental to such winding-up and dissolution;

      (b)      <u>Second</u>, to the setting up of any reserves which the Manager may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company as provided in Section 18-804(b) of the Delaware Act and, subject to such Section 18-804(b), at the expiration of such period as the aforesaid person or persons may deem advisable, for distribution in the manner hereinafter provided; and

      (c)      <u>Third</u>, in accordance with the first sentence of Section 6.1 or the first sentence of Section 6.4 hereof, as applicable.

      8.3     *Cancellation of Certificate of Formation.*  Upon the completion of the distribution of the Company's assets as provided in Section 8.2 hereof, the Company shall be terminated, and the Manager shall cause the Certificate of Formation and all qualifications of the Company as a foreign limited liability company to be canceled and shall take such other actions as may be necessary to terminate the Company.

      8.4     *Deficit Capital Account.*  Upon a liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocations and other adjustments for all Fiscal Years, including the Fiscal Year in which such liquidation occurs), the Member shall have no obligation to make any Capital Contribution, and the negative balance of any Capital Account shall not be considered a debt owed by the Member to the Company or to any other Person for any purpose.

      8.5     *Nonrecourse to Other Members or the Manager.*  Except as provided by applicable law or as expressly provided in this Agreement, upon dissolution, each Member shall receive a return of its Capital Contribution solely from the assets of the Company.  If the assets of the Company remaining after the payment or discharge of the debts and liabilities of the Company are insufficient to return any Capital Contribution of any Member, such Member shall have no recourse against any other Member or the Manager.

8.6    *Distribution in Kind.*

(a)    Notwithstanding the provisions of Section 8.2 which require the liquidation of the assets of the Company, but subject to the order of priorities provided thereunder, if upon the dissolution of the Company the Manager determines that an immediate sale of part or all of the assets of the Company would be impractical or would cause undue loss to the Members, the Manager may, in its absolute discretion, defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Company (other than those to Members) and may, in its absolute discretion, distribute to the Members, in lieu of cash, as tenants in common, undivided interests in such Company assets as the Manager deems not suitable for liquidation.

(b)    Any distributions in kind shall be subject to such conditions relating to the disposition and management of such assets as the Manager deems reasonable and equitable and to any agreements governing the operating of such assets at such time.   The Manager shall determine the fair market value of any property distributed in kind using such reasonable method of valuation as it may adopt.

8.7    *Termination.*   Upon completion of the dissolution, winding up, liquidation, and distribution of the assets of the Company, the Company shall be deemed terminated.

## ARTICLE IX
## General Provisions

9.1    *Notices.*   Any notice, demand or other communication required or permitted to be given pursuant to this Agreement shall have been sufficiently given for all purposes if (a) delivered personally or by overnight courier service to the party to whom such notice, demand or other communication is directed or (b) sent by registered or certified mail, postage prepaid, addressed to the Member or the Company at its address set forth in this Agreement. Except as otherwise provided in this Agreement, any such notice shall be deemed to be given (i) when received if delivered personally or by overnight courier and (ii) three business days after the date on which it was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as set forth in this section.

9.2    *Amendments.*   This document sets forth the entire limited liability company agreement of the Company.   Until such time as all obligations under the Redemption Option Agreement have been satisfied, this Agreement may be amended by the unanimous consent or approval of (i) the Manager and (ii) all of the Membership Interests.   Following the satisfaction of all obligations under the Redemption Option Agreement, this Agreement may be amended by the unanimous consent or approval of all of the Membership Interests.

9.3    *No Rights of Creditors and Third Parties Under Agreement.*   This Agreement is entered into by the Member for the exclusive benefit of the Company, its Members and permitted successors and assigns.   This Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person.   No such creditor or any third party shall have any rights under this Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

- 11 -

9.4     *Construction.*  Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

9.5     *Headings.*  The headings in this Agreement are for convenience only and shall not be used to interpret or construe any provision of this Agreement.

9.6     *Waiver.*  No failure of a Member to exercise, and no delay by a Member in exercising, any right or remedy under this Agreement shall constitute a waiver of such right or remedy.  No waiver by a Member of any such right or remedy under this Agreement shall be effective unless made in a writing duly executed by all Members and specifically referring to each such right or remedy being waived.

9.7     *Severability.*  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law.  However, if any provision of this Agreement shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

9.8     *Binding Effect.*  This Agreement shall be binding upon and inure to the benefit of each of the Members, and its successors and assignees, except no right or obligation of a Member under this Agreement may be assigned by such Member to another Person without first obtaining the written consent of the Manager.

9.9     *Governing Law.*  This Agreement shall be governed by, and construed under, the laws of the State of Delaware, all rights and remedies being governed by said laws.

[Signature Page Follows]

- 12 -

**EXHIBIT B**

      IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Agreement as of the date first indicated above.

Justice Investors, a California limited partnership

By: Portsmouth Square, Inc., a California corporation
      Its Managing General Partner

By:_____
      Name:
      Title:

**Exhibit C**
Criteria for Qualifying Property

832852.4

**Exhibit C**
**Criteria for Qualifying Property**

1. If purchasing real property, the property must be a fee simple or leasehold interest. A limited partner interest in a single-purpose entity that owns real estate may also be purchased.
2. If an operating businesses is being sold with the real estate being purchased (e.g., hotels, retirement communities, hostels, etc.) , and Evon concludes in its sole discretion that such business significantly increases any liability risk, the purchase will not be allowed.
3. Property must be located within the United States.
4. Tenants at the property must be operating a lawful business.
5. If money is borrowed, the loan shall be non-recourse to Justice, Portsmouth, Evon, the Property SPE and the Justice LPs, but may be recourse to the party who will receive the property in lieu of their interest in Justice.
6. Title Insurance must be provided equal to the purchase price of the property. For commercial properties, an ALTA policy must be procured.
7. Property insurance must be procured.
8. Comprehensive General Liability insurance must be procured naming Justice, Evon, Property SPE as additional insured's with coverage of the greater of $1,000,000 per occurrence or 50% of the purchase price of the property.
9. Indemnification agreement, providing indemnification to Justice, Justice LPs, Portsmouth, Evon and Property SPE must be signed by the electing limited partner.
10. A current Environmental Phase I Assessment or similar, third party environmental review document (which meets ASTM Phase I Standard) must obtained for all commercial properties ("Commercial Assessments"). A Homeowners Building Inspection must be obtained for all residential properties. ("Residential Assessments")
11. The Commercial Assessments must not conclude that remediation is required for any Hazardous Substances found at the Property. Hazardous Substances shall specifically exclude materials required for use in the ordinary course of business and property maintenance, provided such items are incidental to the use of the Premises and are stored and used in compliance with all Environmental Laws (term to be defined), or if the business is a retail center, retail tenants' inventory generally held for resale in typical shopping centers, providing such inventory is stored and sold in compliance with Environmental Laws.
12. If the property contains any business that by its nature utilizes significant hazardous materials (such as a gas station or dry cleaner) then the property will not be allowed.
13. No evidence has been discovered indicating the Premises is not currently in compliance with Environmental Laws.
14. There is no outstanding notice (or notices) of non-compliance or alleged non-compliance with respect to Hazardous Substances from any authority having jurisdiction over the Premises.
15. No underground storage tank (or tanks) have been discovered to currently exist, or are known to currently exist, within the Premises.
16. If purchasing a motor vehicle, liability insurance must be procured naming Justice, Evon, Property SPE as additional insureds with coverage no less than $300,000 per person and $500,000 per accident.
17. You will need to execute a lease agreement, in a form acceptable to Evon, covering the period of time from the purchase of the property or vehicle through the assignment of the property or vehicle to you by the SPE.

**Exhibit D**
Form of Indemnity Relating to Qualifying Property

**Form of**
**Indemnity Agreement**

This Indemnity Agreement dated as of [date] is executed by [Name] (the "Electing Limited Partner") in favor of Justice Investors, a California limited partnership ("Justice"), Portsmouth Square Inc. ("Portsmouth"), Property SPE and Evon Corporation ("Evon") with reference to the following facts:

A.    The Electing Limited Partner is a limited partner in Justice.  Portsmouth and Evon are the two general partners of Justice.

B.    Pursuant to a Limited Partner Interest Redemption Option Agreement dated [____] (the "Redemption Option Agreement"), the Electing Limited Partner has elected to redeem its limited partnership interest in Justice.  Capitalized terms not defined herein shall have the definition ascribed to them in the Redemption Option Agreement.

C.    The Electing Limited Partner has further elected the option to have Justice, through Property SPE, a wholly owned but legally independent limited liability company, acquire property described in the Redemption Option Agreement as Qualifying Property, which pursuant to the Redemption Option Agreement Electing Limited Partner will have the option, but not the obligation, to receive in partial or complete redemption of its partnership interest in Justice (the "Property Option")

D.    As a condition to participating in the Property Option, the Electing Limited Partner is required to provide this indemnity covering any claims or losses arising from the acquisition or ownership of any property that is chosen by the Electing Limited Partner pursuant to the Redemption Option Agreement (the "Acquired Property") for the period provided herein.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the Parties agree as follows.

1.    Indemnified Parties.  In consideration for the right to participate in the Property Option, the Electing Limited Partner agrees to provide this Indemnity in favor of (a) Justice; (b) Justice's two general partners, Portsmouth  and Evon ; (c) Property SPE and (d) each of their respective officers, directors, trustees, partners, agents, attorneys, employees, representatives, shareholders, parent companies, subsidiaries, affiliates, successors and assigns of the foregoing (each of the parties in (a) through (d), an "Indemnified Party).

2.    Indemnity.  The Electing Limited Partner will defend, indemnify and hold harmless each Indemnified Party from all actions, suits, claims, payments, losses, liabilities, damages, settlements and costs of any kind whatsoever (including attorneys' fees) arising out of or relating to Property SPE's direct  acquisition of Acquired Property or indirect acquisition of Acquired Property through a subsidiary entity referred to in the Redemption Option Agreement as a Qualifying Property SPE (collectively, "Losses"), including without limitation Losses directly or indirectly suffered by any such Indemnified Party relating to or arising from the ownership of the such Acquired Property by Property SPE or any

Qualifying Property SPE, including any environmental claims, and any obligations to third parties relating to such Acquired Property (other than the obligation on the part of Property SPE to pay the required portion of the Optionee Allocable Amount).  Notwithstanding anything to the contrary in this section, the Electing Limited Partner shall have no obligation to indemnify any Indemnified Party for any Losses resulting from the gross negligence or intentional misconduct of such Indemnified Party, which such Indemnified Party is determined by a court of competent jurisdiction to have committed.

       3.    <u>Procedural Matters</u>.  The Indemnified Party(ies) will give the Electing Limited Partner (A) prompt written notice of any claim that could give rise to the indemnity, provided that the failure or delay to so notify the Electing Limited Partner will not relieve the Electing Limited Partner from any liability that it may have to an Indemnified Party so long as the failure or delay will not have materially prejudiced the defense of a claim; (B) reasonable assistance in defending the claim; and (C) sole authority to defend or settle such claim with counsel reasonably acceptable to Justice, Portsmouth and Evon; provided that the Indemnified Party(ies) will not be required to consent to a judgment against it or enter into a settlement that is prejudicial to it.  If the Electing Limited Partner elects not to defend any such claim, the Indemnified Party(ies) will have the option, but not the duty, to reasonably settle or defend the claim at its cost and the Electing Limited Partner will indemnify the Indemnified Party(ies) for such settlement or defense and any Loses finally awarded against the Indemnified Party(ies) attributable to such claim.

       4.    <u>Time Limit</u>.  The obligations of Electing Limited Partner hereunder shall terminate and be of no further force or effect if Justice or Property SPE continue to directly or indirectly own the subject Qualifying Property following expiration, pursuant to the Redemption Option Agreement, of both Electing Limited Partner's options to acquire such Qualifying Property and Justice's options to transfer the Qualifying Property to Electing Limited Partner in redemption of its limited partnership interest in Justice.

       5.    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties hereto regarding the subject matter of this Agreement and supersedes all prior negotiations, agreements, statements, understandings, terms, conditions, representations, and warranties, whether oral or written, concerning the subject matter of this Agreement.

       6.    <u>Amendments</u>.  This Agreement may be modified only by a written agreement signed by the Electing Limited Partner, Justice, Portsmouth, Property SPE and Evon.

       7.    <u>No Third Party Beneficiaries</u>.  This Agreement is entered into for the sole protection and benefit of the Indemnified Parties and the Electing Limited Partner and their respective permitted successors and assigns.  No other Person shall have any rights or causes of action under this Agreement.

       8.    <u>No Waiver by any Indemnified Party</u>.  No waiver by any Indemnified Party of any of its rights or remedies under this Agreement or of any of the terms or conditions of this Agreement shall be effective unless such waiver is in writing and signed by such Indemnified Party, and in such case such waiver shall only apply to the executing Indemnified Party.  Without limiting the generality of this Section, (a) no delay or omission

832507.4

by an Indemnified Party in exercising or enforcing any of its rights or remedies under this Agreement shall constitute or be construed as a waiver of such rights or remedies; and (b) no waiver by an Indemnified Party of any default by the Electing Limited Partner under this Agreement or consent by any Indemnified Party to any act or omission by the Electing Limited Partner shall constitute or be construed as a waiver of or consent to any other or subsequent default, act or omission by the Electing Limited Partner.

9.     <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that no transfer of the Property or any interest in the Property by the Electing Limited Partner shall release the Electing Limited Partner from any of its obligations under this Agreement.  The Electing Limited Partner shall not assign or delegate its duties under this Agreement without the prior written consent of Justice, Portsmouth and Evon, which consent may be withheld by any of the foregoing in its sole and absolute discretion.

10.     <u>Attorneys' Fees and Costs</u>.  If the Electing Limited Partner breaches any of the terms or conditions of this Agreement, the Electing Limited Partner shall pay all costs and expenses, including attorneys' fees and costs, incurred by any Indemnified Party in enforcing this Agreement immediately upon such Indemnified Party's demand, whether or not any action or proceeding is commenced by such Indemnified Party.

11.     <u>Cumulative Remedies; Costs</u>.  No right or remedy of any Indemnified Party under this Agreement shall be exclusive of any other right or remedy to which such Indemnified Party may be entitled.  The Electing Limited Partner shall perform and comply with all of its obligations under this Agreement at its sole cost and expense.

12.     <u>Applicable Law; Jurisdiction</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of California.  The Electing Limited Partner agrees that service of process on it may be effected by certified or registered mail, return receipt requested, directed to the Electing Limited Partner at the Electing Limited Partner's address shown in the Redemption Agreement.

13.     <u>Interest</u>.  All costs, fees, expenses, advances, and other amounts paid by any Indemnified Party in connection with any Losses (a) shall be payable by the Electing Limited Partner to such Indemnified Party on such Indemnified Party's demand; and (b) shall bear interest from the date of expenditure by such Indemnified Party at the rate of [____].

14.     <u>Severability</u>.  If any provision of this Agreement shall be held by any court of competent jurisdiction to be unlawful, voidable, void, or unenforceable for any reason, such provision shall be deemed to be severable from and shall in no way affect the validity or enforceability of the remaining provisions of this Agreement.

15.     <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall constitute an original, and all of which shall constitute one and the same document.

832507.4

**Exhibit D**

      IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly and properly executed as of the day and year first above written.


**ELECTING LIMITED PARTNER**

**[NAME]**


By: _____
Name:
Title:


**JUSTICE INVESTORS**


By: _____
Name:
Title:


**PORTSMOUTH SQUARE  INC.**


By: _____
Name:
Title:


**EVON CORPORATION**


By: _____
Name:
Title:


**PROPERTY SPE**


By: _____
Name:
Title:

832507.4

**Exhibit E**
Form of Qualifying Property PSA Assignment

832852.4

BILL OF SALE, ASSIGNMENT
AND ASSUMPTION AGREEMENT

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Assignment**") is made as of the 12th day of November, 2013 (the "**Effective Date**"), by and among Kellogg and Andelson Accountancy Corporation, a California Professional Corporation ("**Assignor**") and K & A Global Management Company, a California corporation ("**Assignee**"), with reference to the following facts:

## RECITALS

A.      Assignor and _____ (the "**Seller**") are the parties to that certain Agreement for Purchase and Sale of Real Property dated as of _____ (as amended, the "**Purchase Contract**") pursuant to which Seller agreed to sell the real property (the "**Property**") more particularly described on Exhibit "A" to the Purchase Contract to Assignor.

B.      Assignor desires to assign the Purchase Contract and all right, title, and interest thereunder to Assignee, and Assignee desires to assume and perform all the agreements and obligations of Assignor under the Purchase Contract.

C.      Accordingly, Assignor shall transfer to Assignee all of Assignor's right, title and interest in and to the Purchase Contract on the following terms and conditions.

**NOW, THEREFORE**, in consideration of the foregoing Recitals (which Recitals are hereby incorporated into the body of this Assignment), the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

## AGREEMENT

1.      **Assignment of Purchase Contract.**   Assignor hereby assigns, sells, transfers, grants, delivers and conveys to Assignee, and Assignee hereby accepts such assignment of all of Assignor's right, title and interest in, to and under the Purchase Contract and in and to the "Deposit" (as defined in the Purchase Contract) (collectively, the "**Assigned Rights**").

2.      **Assumption.**   Assignee hereby accepts said assignment, sale, transfer and conveyance of the Assigned Rights and assumes and agrees to keep, perform and be bound by all of the terms, covenants, conditions and obligations which are required to be performed by Buyer under the Purchase Contract.

3.      **Effective Date.**  This Agreement shall be effective as of the date hereof.

4.      **Further Assurances.**  Assignor and Assignee each agrees that it will at any time and from time to time after the date hereof, on the written request of the other party, execute, acknowledge and deliver, or cause to be delivered, all such further documents and assurances and perform all such further acts as may be reasonably requested by such requesting party to implement and give effect to this Assignment.

832517.1

5.     <u>Successors and Assigns</u>.  This Assignment shall be binding upon and inure to the benefit of the successors, assignees, personal representatives, heirs and legatees of all the respective parties hereto.

6.     <u>Governing Law</u>.  This Assignment shall be governed by, interpreted under, and construed and enforceable in accordance with, the laws of the State of _____.

7.     <u>Counterparts</u>.  This Assignment may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Assignment.

8.     <u>No Third Party Beneficiaries</u>.  Assignor and Assignee shall not be deemed to be in privity of contract with any other third party nor shall any provision of this Agreement be construed or deemed to create any third party beneficiary status for any third party.

9.     <u>Miscellaneous</u>.  Headings in this Assignment are for convenience only and shall not define or limit the provisions hereof.  This Assignment shall be construed according to its ordinary meaning and shall not be strictly construed for or against any party hereto.  Any modification or waiver of any term of this Assignment, including a modification or waiver of this term, must be in writing signed by the party or parties against whom enforcement of the modification or waiver is sought.  Except for the Purchase Contract and the documents referenced therein, this Assignment constitutes the entire agreement among the parties pertaining to the subject matter hereof and all prior and contemporaneous agreements, representations and understandings, written or oral, express or implied, are hereby superseded and merged into this Assignment.  Should any term, provision, covenant or condition of this Assignment be void, invalid or inoperative, the same shall not affect any other term, provision, covenant or condition of this Assignment, but the remainder thereof shall be effective as though such void, invalid or inoperative term, provision, covenant or condition had not been contained herein.

[Signatures on next page.]

832517.1

**IN WITNESS WHEREOF**, Assignor and Assignee have caused their duly authorized representatives to execute and enter into this Assignment as of the date first set forth above.

**ASSIGNOR**

_____

By: _____
Name: _____
Title: _____

**ASSIGNEE**

_____

By: _____
Name: _____
Title: _____

832517.1

## CONSENT TO ASSIGNMENT

The undersigned, as the Seller under the Purchase Contract hereby consents to the foregoing Assignment to which this Consent to Assignment is attached; provided however, that Seller's consent is not a waiver of its rights under the Purchase Contract with respect to any future transfer of the Property or assignment of rights under the Purchase Contract.

_____

By:_____

Name:_____

Title:_____

Exhibit F
Form of
Limited Power of Attorney

## KNOW ALL PERSONS BY THESE PRESENTS:

That I, _____[Insert Name of Optionee] ("Optionee"), of the County of _____[Insert Name of County Where Power Signed], State of California, hereby make, constitute and appoint Justice Investors, a California limited partnership (the "Partnership"), to act as my true and lawful attorney-in-fact for me and in my name, place, and stead and for my use and benefit as set forth below.

The Partnership shall have the irrevocable power and right, should it exercise its option to redeem the Optionee's partnership interest in the Partnership, to take such actions on behalf of Optionee as are necessary to implement such redemption during the period of time provided for in Section 4 of that certain Limited Partnership Interest Redemption Option Agreement by and among Optionee, the Partnership and Evon Corporation, a California corporation, to which this Form of Limited Power of Attorney is attached as Exhibit "F." All acts done by the Partnership during the period set forth herein shall have the same effect and inure to the benefit of and bind me and my successors in interests as if done by me.

IN WITNESS WHEREOF, the undersigned has executed and delivered this Limited Power of Attorney this _____ day of _____, 201_.

_____
[Name of Optionee]

By: _____
Name:
Title:

_____
Name:
Residing at: _____
_____

_____
Name:
Residing at: _____
_____

832852.4